## Case No. 14,834.

UNITED STATES v. COLLINS et al.

[4 Blatchf. 142; 1 21 Law Rep. 37.]

Circuit Court. S. D. New York. April 1, 1858.

JUDGMENT — EXECUTION SALE — MORTGAGES — INJUNCTION—GOVERNMENT CONTRACT TO CARRY MAIL—LIENS.

1. Under the facts of this case, the government of the United States had no right to withhold from a party who had contracted with it to perform a mail service by sea, a portion of the pay provided for by the contract.

2. Under Act June 27, 1848 (9 Stat. 241), the power of the postmaster general to impose a fine on a contractor for the transmission of mails to and from foreign countries, for any unreasonable or unnecessary delay in the departure of the mails, or in the performance of the trips, is limited to the cases and for the causes specified in the act.

3. A recommendation made by the postmaster general to the secretary of the navy, to make a deduction from the pay of a contractor, on the ground that a portion of the service was performed by a steamer not of the class stipulated for in the contract, is not the imposition of a fine, within the terms of that act.

4. Where the creditor of a steamship company was proceeding to sell its steamers under an execution issued by a state court, and the government of the United States applied to this court to restrain such sale, on the ground that it had liens on the steamers, under chattel mortgages for advances made to build them, and a sale under the mortgages required a prior notice of six months: *Held*, that the rights of the execution creditors were superior to those of the government, so far at least as to allow them to sell the vessels subject to the lien of the government.

5. Whether the granting by this court of an injunction to stay such sale, is not forbidden by section 5 of the act of March 2, 1793 (1 Stat. 334), which prohibits the courts of the United States from granting an injunction to stay proceedings in any court of a state, quere.

[Cited in Yick Wo v. Crowley, 26 Fed. 208.]

This was an application for a provisional injunction against [Edward K. Collins] William Brown and others, creditors of the New York and Liverpool United States Mail Steamship Company, who had obtained judg-

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

ments upon their demands against that company, in the courts of the state of New York, and had issued executions thereon to the sheriff of the city and county of New York, to restrain and prevent the sale, under such executions, of the mail steamers Atlantic and Baltic, upon which vessels it was claimed that the United States had liens, under certain deeds of trust or chattel mortgages, for moneys advanced towards building and completing those vessels.

Theodore Sedgwick, Dist. Atty.

Charles O'Conor, Francis B. Cutting, and Clarkson N. Potter, for defendants.

HALL, District Judge. It is not alleged that the judgments upon which the executions were issued were fraudulently obtained, or that there is any reason to doubt, that the demands upon which they were rendered, were legally and justly due to the plaintiffs in such executions. Indeed, no collusion whatever is alleged, and neither fraud nor bad faith is imputed to any of the defendants. The claim of the United States is based on the allegation, that they have a lien for advances upon the steamships named; and the equitable ground upon which the motion for an injunction is based, may be very briefly stated, in the very language of the bill. That language is as follows: "And the plaintiffs further show, that they have reason to believe, and do believe and apprehend, that if the said steamships are sold, any purchaser or purchasers of the said steamships will have the power to remove, and may remove, the same out of the jurisdiction of this court and of the United States, and in that case the plaintiffs would be wholly remediless."

The defendants, by their affidavits and by other papers read in opposition to the motion, strike at once at the foundation of the plaintiffs' rights, and insist that there is no longer any legal or equitable lien upon the Atlantic and Baltic, under the deeds of trust or chattel mortgages, because the lien for such advances has been, or should be, fully cancelled by the secretary of the navy. That officer has, as they allege, withheld from the owners of such steamships an amount due to them for mail service rendered to the government, much larger than that now claimed by the United States; and they produce a copy of an opinion of Mr. Attorney General Black, dated June 4th, 1857, and given at the request of the secretary of the navy, in which, after an elaborate examination, he decides that, upon the case presented to him, and which certainly was not a stronger one against the government than that presented upon this motion, the amount now claimed by the steamship company was improperly, and without authority, withheld. After a careful reading of this opinion of the attorney general, I cannot but assent to his conclusion, that the deductions made

from the sums claimed by the steamship company for mail service, have not been legally made.

Perhaps I might properly refuse the injunction in this case without stating any reasons for my judgment beyond those furnished by the very full and elaborate opinion of the learned attorney general; and certainly a court of equity should require very clear and satisfactory evidence that the attorney general had mistaken either the facts or the law of the case, before interposing, by injunction, to prevent the due execution of the final process of another court, issued in behalf of an honest creditor, to enforce his adjudicated and admitted rights, upon the mere ground that the execution of such process, and the enforcement of such rights, might possibly, or would probably, prevent the government from taking legal or other proceedings to enforce a claim which its highest law-officer had deliberately declared to be unfounded. It may, however, give more satisfaction to the parties and their counsel, if I state some of the reasons on which I base my opinion.

It is unnecessary to state in detail the terms of the original contract for the building of the steamships which have been known as the steamships of the Collins line, or even to give at length the deeds of trust, or chattel mortgages, under which the United States now claim. It has not been contended that the bill in this case can be sustained upon the ground that there has been a failure to perform the agreements contained in the original contract, and that the government has become entitled to an uncertain sum by way of damages; and the claim now made by the government is based entirely upon the assumption that there is a balance due the United States for the moneys advanced under such deeds of trust; or chattel mortgages. Those deeds of trust were severally intended as security for the advances made under them in pursuance of an act of congress authorizing such advances, and requiring the repayment thereof to be secured by a lien on such ships, in such manner as the secretary of the navy should require. They have been regarded as mortgages, as they are in substance; and it is alleged in the bill that they have been duly and annually filed in the office of the register of the city and county of New York, as required by the laws of New York, to make them valid and continuing liens, as chattel mortgages, against judgment creditors and subsequent incumbrancers. By the first of those deeds of trust, the then owners of the steamships Pacific (since totally lost at sea) and Atlantic, did bargain, sell and convey the said steamships, with all their tackle, apparel and furniture, to the trustee therein named, upon trust, nevertheless, that the said owners were to retain the possession of such steamships, and employ them 'n carrying the mails, &c.; and if, after the expiration of one year from the commencement of their employment in the mail service, under the existing contract with the United States, being required thereto in writing by the secretary of the navy, they should fail to repay in money, or to refund out of their compensation for mail service, for one year, or out of the value of said vessels. if, before the expiration of one year, they should be taken into the service of the United States, such outstanding balances as might be due on account of such advances, and the interest thereon, then the said trustee, being required so to do by the secretary of the navy of the United States, should, after advertising, for six months, in two newspapers published in the city of New York, the time and place of such sale, proceed to sell at public auction, for cash, the said steamships, &c., and, out of the proceeds of said sale, pay, first, the expenses of executing such trust, and secondly, such unsatisfied balances of advances, &c. This is the substance of the provisions of that deed of trust, so far as the same appear to me to be material to the questions presented upon the present motion; and the provisions of the deed of trust in regard to the Baltic, though somewhat different in form and language, are, in substance, very nearly the same. By those provisions, the rights and the remedies of the United States as against the vessels are precisely declared and limited; and, although it may now be seen that more summary proceedings for enforcing the repayment of the advances, by the sale of the ships mortgaged, would be more beneficial to the United States, if its claim for the large balance now demanded could be sustained, a court of equity cannot reform the contracts and introduce provisions which were never assented to by the parties, or intended by them to be embraced therein.

The United States insist that there is a balance of $115,500 due for advances made under those deeds of trust; and the defendants insist that there is a larger amount due to the steamship company for mail service in the year ending on the 31st March, 1857, which they are entitled to set-off, and which the government is legally and equitably bound to set-off, against the balance now claimed, so far as such set-off may be necessary, in order to extinguish the alleged indebtedness to the government. The government, on the other hand, insists, that the secretary of the navy has fully paid for the mail service rendered, and that nothing is now due therefor. The mail service for which compensation is so claimed, was agreed to be rendered by a contract made with the secretary of the navy, by which Collins and his associates agreed to build certain steamers—each to be of at least two thousand tons burthen and one thousand horse power—and with such steamers to carry the mails between New York and Liverpool, according to the terms of the contract. The mail service required to be performed by the contract, and the compensa-

tion therefor, were afterwards increased in pursuance of subsequent acts of congress. and the five steamers provided for in the contract, were, it is conceded, built by Collins and his associates, and those claiming under them, and were accepted by the navy department as having been built in compliance with the contract. Unfortunately, however, two of the steamers have been lost at sea. No fault has been imputed to Collins or his associates, in respect to either of those losses. In consequence of the loss of the Arctic. and the unexplained delay in the arrival of the Pacific —justifying the belief that she had gone down at sea—the owners of the remaining steamers were unable to transport the mails to and from Liverpool and New York in such steamers as were, by the contract, to be employed in that service. Under these circumstances, Mr. Collins, on the 17th of March, 1856, applied to the secretary of the navy, and solicited "permission to take a steamship to supply the place of the Pacific," and asked a telegraphic dispatch in reply. A favorable answer was communicated by telegraph, and, on the 22d of the same month, Mr. Collins inclosed to the secretary of the navy a duplicate of his letter of the 17th. and informed him that, in accordance with his telegraphic dispatch, they had chartered the Ericsson. In the same letter, he requested the secretary to write him confirming the telegraphic dispatch. On the 24th of the same month, and in reply to Mr. Collins' letter of the 22d. the secretary, having been thus apprised of the character of the Ericsson for the purpose of supplying the place of the Pacific, in the transportation of the mail, wrote to Mr. Collins as follows: "Navy Department, March 24th, 1856. Sir: In reply to your letter of the 22d instant, the department hereby confirms its dispatch to you by telegraph on the 19th instant, consenting to your supplying the place of the Pacific by substituting another steamship. Very respectfully, your obedient servant, J. C. Dobbin. E. K. Collins, Esq., No. 56 Wall Street. New York." On the 18th of April. 1856. Mr. Collins again wrote to the secretary of the navy. advising him of the launch of the Adriatic. and asking permission. in the event of the non-arrival of the Pacific, to substitute another steamer in her place, until the Adriatic should be ready for sea; and, on the 21st of the same month, the secretary wrote the following, in reply: "Navy Department, April 21st. 1856. Sir: In reply to your letter of the 18th inst., the department consents to the substitution of another steamship. in the place of the Pacific. supposed to have been lost, until the Adriatic is ready to be placed on the line. Very respectfully, your obedient servant, J. C. Dobbin. E. K. Collins, Esq., No. 56 Wall Street, New York." This correspondence is, in my judgment, sufficient evidence of the unqualified and unconditional consent of the secretary of the navy, that the Ericsson, or some other steam vessel, competent to the performance of the mail service required of a vessel of the Collins line. should be substituted for the lost Pacific. in the performance of mail service, not only for the trip referred to in the first letter of Mr. Collins and the telegraphic dispatch in reply, but also until a reasonable time to prepare the Adriatic for sea had elapsed. It is idle to suppose that the secretary intended to require that the service should be performed by a steamship built in pursuance of the original contract for such mail service, or equal in all respects to the other vessels of the Collins line; for it is safe to assume, upon the affidavits read and the admissions made by the district attorney upon the argument—and it might almost be assumed as a matter of public history, of which the court was bound to take judicial notice—that the secretary, as well as Mr. Collins, well knew no such vessel could be obtained for the service. If, then, it was intended to qualify such consent by a condition that a reduction in the amount of mail-pay should be submitted to, at the discretion of the postmaster general, or the secretary of the navy, or otherwise, the condition should have been expressly and distinctly made.

I shall not stop to inquire whether the secretary of the navy had authority to consent to this substitution for the purpose of mail transportation, but shall assume, as the postmaster general, the secretary of the navy, the attorney general, and the accounting officers of the treasury appear to have assumed, that he had such authority. Upon that assumption, large sums have already been paid for the mail service rendered by the Ericsson. and the authority of the secretary to make the arrangement was not questioned on the argument. The claim on the part of the government is not that the parties represented by Mr. Collins were not entitled. under their contract, to payment for such services, but that the government, or its officers, have a right to make a reduction from the stipulated compensation, or to impose a fine or penalty upon the contractors, upon the ground of inferior service, or delay, in the transportation of the mails. It is conceded that no provision, in. the original or any subsequent contract, authorizes, either expressly or by necessary implication, the deduction made, or the imposition of any fine or penalty, under the circumstances of the present case; and, the contract having expressly provided that there should be a forfeiture of the pro rata pay for the trip, either from New York to Liverpool. or from Liverpool to New York, when the trip is not made and the mails delivered," and having fixed no time within which the trips should be run. a forfeiture or deduction because one steamer was fourteen days making a trip, whilst another was able to make it in twelve; would not. of itself. subject the contractors to either fine, penalty or forfeiture. If these contracts and this correspondence were the contracts and corres-

pondence of private parties, I should certainly hold that the full amount of mail-pay might be legally claimed for each of the trips of the Ericsson, and the same measure of justice must be applied between the government and its contractors as between private parties to like contracts.

It was, however, very ably argued by the learned district attorney, that the deductions made were made under the provisions of the act of congress approved June 27. 1848 (9 Stat. 241); and that, that statute having vested in the postmaster general the power to impose fines on contractors at his discretion, subject only to the limitations prescribed in the act, his action was conclusive, and could not be reviewed in a court of law or equity. And it was insisted that the learned attorney general had omitted in his opinion, to refer to the provisions of that act; and that, therefore, the claim of the government might be sustained, and the injunction asked for might be granted, without repudiating the principles of the attorney general's opinion. It was also insisted, that the postmaster general's action was conclusive upon the parties and upon the court, and that he had the power of considering and determining, in the absence of the parties to be affected by his decision, and without appeal. not only the amount of fine or reduction, but whether the circumstances of the particular case justified the exercise of the power to impose a fine, or order a deduction, under the provisions of the act.

Waiving entirely the discussion of the question whether the congress of the United States can, by law, change the terms of an existing contract to which the United States government is a party, and not stopping to inquire whether the doctrine of this court, that one who invokes the exercise of its equitable jurisdiction must himself do equity, may or may not be applicable to the case, and not considering that this court, as a court of equity, does not lend its aid to enforce penalties and forfeitures, although it may, perhaps, relieve against penalties when they have been imposed under a mistake in regard to the facts of the case, and the parties interested have not been afforded an opportunity to be heard in opposition, there is, I think, a conclusive answer to the argument of the learned attorney for the United States. That answer is, that no fine has ever been imposed under the provisions of the act referred to; and, probably, for the simple reason, that no case has arisen justifying such action on the part of the postmaster general. The act referred to enacts, that, "to secure the regular transmission of the mail to and from foreign countries, the postmaster general be and he is hereby authorized and required to impose fines on contractors, for any unreasonable or unnecessary delay in the departure of such mails, or in the performance of the trip; provided, that the fine for any one default shall not exceed one-half of the

contract price paid for the trip." Now, the whole action of the government assumes, that the trip was made by the Ericsson under the contract with Collins and his associates, and, if I am right in the conclusion, that the secretary of the navy, on behalf of the government, unqualifiedly and unconditionally consented to the substitution of that vessel for the Pacific, in the performance of the mail service required under the existing contract, the only question remaining open, and certainly the only one so. far as the right to impose a fine under this statute is concerned, is, whether there was unreasonable or unnecessary delay in the departure of the mails sent by the Ericsson, or in the performance of her trips. No such delay has been shown. It has not been pretended that the mails did not depart at the proper time, nor has it been insisted that the Ericsson was not run with reasonable rapidity. Indeed, it was shown by affidavit, and virtually conceded, that the contractors, or those claiming under them, had procured as good a steamer, in respect to speed, size, &c., as could be procured for the service, and had, in good faith and with commendable energy, diligence and skill, earnestly endeavored to carry out their contract. There was, therefore, no case for the exercise of the power of the postmaster general under the act, and it is clear that he never, either in form or substance, assumed to exercise it in the case of the trips of the Ericsson, at least so far as the facts have appeared upon the hearing of this motion. The power to impose a fine is limited to the cases and for the causes specified in the act; and the power, though an administrative power, is so far judicial in its character, that it must appear that the officer clothed with the power has assumed to exercise and has in fact exercised it. It must, therefore, appear that the postmaster general has imposed a fine for the prescribed cause—that he has completed the exercise of the power in the particular case, not that he has advised the head of another department to make a deduction from the pay of a contractor, on the ground that an inferior service has been performed.

In this case, no order or adjudication of the postmaster general imposing a fine has been shown, and the only evidence of the action of the postmaster general, which has been furnished on this hearing, is a copy of a letter addressed by that officer to the secretary of the navy, under date of June 30th, 1856, and the statement, in the opinion of the attorney general, that such a letter was at that time addressed by the postmaster general to the secretary. That letter is in the following words: "Post-Office Department, Washington, June 30th, 1856. Sir: The certificates on the files of this department show that the Collins line of steamers have performed twelve trips between New York and Liverpool, carrying the United States mails, (six outward from New York and six inward,)

from the 23d of April to the 22d June, 1856, inclusive. Four of these trips (two outward and two inward) having been performed by the Ericsson, an irregular steamer, and not of the class stipulated for in the contract, I advise, by reason of the inferior service which has been given, that there be allowed $15,000 per round trip, or $30,000 for the four trips performed by the said steamer. The prices paid by government for each round trip performed by the Bremen line is $16,666.66, and by the Havre line $12,500, and fifteen thousand dollars a round trip is therefore considered a liberal compensation for the Ericsson. It is, therefore, recommended, that the sum of thirty-six thousand dollars ($36,000) be deducted from the mail-pay of the present quarter. I am, very respectfully, your obedient servant, James Campbell. The Hon. J. C. Dobbin, Secretary of the Navy." It will be observed, that the postmaster general, in this letter, entirely fails to notice the important fact, that the Ericsson had been unconditionally substituted for a regular steamer of the Collins line, in the performance of this mail service, by the consent of the secretary of the navy. A fact so important to the recommendation made would, as it strikes me, have been referred to by the postmaster general, if it had been within his official knowledge; and, if such fact had been duly considered by him, it is not probable that such a recommendation would have been made. But a more important feature of this letter is to be noticed. That is, that the postmaster general does not state that there has been any unreasonable or unnecessary delay in the departure of the mails, or in the performance of any trip; that he does not state that he has imposed or intends to impose any fine for any such delay; that he only advises and recommends that the secretary of the navy allow $30,000 for the two round trips performed by the Ericsson, deducting $36,000 from the contract price of such trips; and that he bases such advice and recommendation, not on the ground of unreasonable or unnecessary delay, but on the ground of the inferior service given, the trips having been performed by an irregular steamer, not of the class stipulated for in the original contract. The fact that he did not assume or attempt to exercise any power conferred by the act of 1848 before alluded to, is sufficiently evidenced by these circumstances, and by the fact that the deduction recommended exceeded by $3000 the highest fine which he could have imposed under that act. It appears, from the opinion of the attorney general, that this letter of the postmaster general was sent from the navy department to the fourth auditor without any direction or remark; and that the auditor struck off $36,000 accordingly. A like similar deduction, on substantially the same grounds, was afterwards made.

When this action of the postmaster general was made known to Mr. Collins, he addressed a letter to the secretary of the navy, remonstrating against the deduction, insisting that the substitution of the Ericsson had been consented to without any intimation that the government would withhold any part of the mail-pay, and stating that, having acted upon the absolute permission to employ another steamer, without any terms or conditions being imposed, he trusted that the secretary would reconsider the matter and direct the balance of the last quarter to be remitted. On the 16th of the same month, Mr. Collins transmitted to the secretary of the navy a duplicate of his letter of July 5th, and requested an early reply. On the 17th, the secretary of the navy acknowledged the receipt of the last-mentioned two letters, and added: "No reply has been given to the first, because it is still under the consideration of the department. When the matter has been decided, you shall be informed of the result." It is shown, by affidavit, that no notice that the matter had been finally decided by the navy department has ever been given. The attorney general's opinion shows that it was pending before him as late as June 4th, 1857, on which day —some months after Mr. Secretary Dobbin had left the department—he gave an opinion in favor of the contractors; and no evidence has been furnished that any final decision has since been made by the secretary of the navy. If such a decision has ever been made, the neglect to give the promised notice to Mr. Collins has probably been occasioned by the retirement from office of the secretary who promised to give the notice, and by the circumstance that the fact that such a promise had been made had never been communicated to his successor. It will thus be seen—although the fact, in a legal point of view, may not be of much significance—that there is no direct evidence that the secretary of the navy has not concurred, or will not concur, in the opinion of the attorney general.

Nor has it been shown that the secretary of the navy has, in writing, required Collins and his associates, or those claiming under him, to refund the balance now claimed on account of advances made on said steamships, in money, or out of the compensation due for mail service, as required by the provisions of the deeds of trust before referred to—the letters of the district attorney, written under the instructions of the secretary of the navy, not being a strict and technical compliance with the conditions of the deeds of trust. But I do not choose to rest my decision upon any technical ground, being entirely satisfied that the defendants have a right to insist that there is a larger sum due for mail service than that yet remaining unpaid on account of the advances secured by the trust deeds, and also to insist, in this court, that one claim shall be set off against the other.

If, however, I could reach the conclusion

that there would still be a balance due to the government, upon the equitable adjustment of its accounts with the Collins line, I should be unable to find any solid ground on which to rest a decision in favor of the United States, upon the present motion. The execution creditors have a present right to proceed to sell the Atlantic and Baltic, subject to the lien, if any, which the government has thereon; and, if that lien is good and valid as against those execution creditors, a sale under such executions must necessarily be subject to such lien. The execution creditors have a present right to sell under their executions. Such is the remedy given them by law. The United States have at best but a right to sell after a notice of six months, according to the express terms of their contract. Both are strictly legal rights. Certainly the rights, and even the equities, of the execution creditors, would even then be superior to those of the United States, so far, at least, as to allow them to sell the steamships, subject to the liens of the government. That they may be sold to some unknown person, that such person may possibly take them beyond the jurisdiction of the United States, and the existence of a vague fear that the claim of the United States may be endangered thereby, is no sufficient ground for postponing the claims of the execution creditors until the expiration of the six months required to perfect a sale under the deeds of trust or mortgages. This court cannot order a present sale of the steamers under the deeds of trust, and the neglect of the United States to provide, by those instruments, for a more summary proceeding to enforce their rights, and for taking possession of the property, upon a failure to repay the advances according to the terms of the contract, furnishes no equitable ground for relief against the execution creditors, whose rights, such as they are, are absolute and may be legally and equitably carried into immediate execution. I am, therefore, entirely clear, that the United States have shown no equities superior to those of the execution creditors, and that they are not entitled to the injunction prayed for.

It must not be supposed that, in thus expressing a decided and confident opinion against this motion, I intend to intimate that it was improper to present this case for the consideration of this court. The questions presented are judicial in their character, and properly belong to the courts of the United States; and the head of an executive department and the district attorney may, therefore, well decline, in a case of the magnitude and importance of that presented by the bill in this case, to take the responsibility of deciding, as administrative officers, against a claim of the United States which can be readily made the subject of judicial investigation.

It may be proper, also, to state, that if I had reached a different conclusion in regard to the equities of the parties, I should have felt bound to ask an argument upon, and to have seriously considered, a question not raised at bar, before ordering an injunction in this case. Section 5, Act March 2, 1793 (1 Stat. 334), prohibits the courts of the United States from granting an injunction "to stay proceedings in any court of a state." This term "proceedings" may properly, and, I think, must necessarily, include all steps taken by the court, or by its officers, under its process, from the institution of the suit until the close of the final process of execution which may issue therein. Cropper v. Coburn [Case No. 3,416]. But, as this question has not been argued, I do not rest my decision upon this ground.

The motion for a preliminary injunction is denied.